# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

WHITE OAK REALTY, LLC                           CIVIL ACTION

VERSUS                                          NO: 13–4761

UNITED STATES ARMY CORP
OF ENGINEERS, ET AL.                            SECTION "H"(3)

## <u>ORDER AND REASONS</u>

Before the Court is a Motion to Dismiss or Alternatively for a More Definite Statement.[1]  For the following reasons, the Motion is DENIED.

## BACKGROUND[2]

This is a civil action for declaratory and injunctive relief.  The plaintiffs

---

[1] R. Doc. 32.

[2] The following facts are drawn primarily from the second amended complaint.  *See generally* R. Doc. 31.

1

are White Oak Realty, LLC and Citrus Realty, LLC.  The defendants are the United States Corps of Engineers (the "Corps") and various Corps employees. The dispute involves mitigation requirements imposed by the Corps on a tract of land in Southeast Louisiana ("Idlewood Stage 2") jointly owned by Plaintiffs.

In response to the devastation caused by Hurricanes Katrina and Rita, Congress authorized the Corps to undertake a series of projects collectively known as the Hurricane and Storm Damage Risk Reduction System ("HSDRRS").  One of these projects involves the use of soil and clay ("borrow material") to reinforce levees and floodwalls in the Gulf South. Under the applicable statutes and regulations, the Corps determines whether a particular location is a suitable source of borrow material and if so whether mitigation of losses to fish and wildlife is necessary.[3]

At some point in 2010, Plaintiffs discovered the presence of borrow material in Idlewood Stage 2.[4]  They subsequently filed a "suitability determination" with the Corps to confirm the borrow material could be used in HSDRRS projects.  In October 2010, the Corps issued a preliminary report approving the use of borrow material from Idlewood Stage 2 and nine other sites.[5]  The report found that the excavation of borrow material from Idlewood Stage 2 would cause "unavoidable impacts" to the environment.[6]  Accordingly, if Idlewood Stage 2 were ultimately approved for HSDRRS projects, the

---

[3] *See* 33 U.S.C. § 2283.

[4] The complaint is unclear as to when Plaintiffs discovered the borrow material.

[5] *See* R. Doc. 31-1.

[6] *Id.* at p. 15.

landowner or contractor would be required to provide compensatory mitigation prior to excavation by purchasing credits from a mitigation bank.[7]

In a letter dated November 4, 2010, the Corps notified Plaintiffs that Idlewood Stage 2 "appears to be acceptable for use as a source" of borrow material.[8] The letter confirmed the preliminary report's determination that excavation would harm the environment.[9] The letter required Plaintiffs to "provide proof of mitigation to the Corps[] . . . prior to excavation."[10] The Corps issued a similar letter on April 14, 2011, reaffirming the requirement that Plaintiffs provide mitigation.[11] The letter informed Plaintiffs that their "compensatory mitigation requirements may be met" by obtaining credits from select mitigation banks.[12]

Plaintiffs subsequently hired Mitigation Strategies, LLC ("Mitigation Strategies") hoping to convince the Corps of the "legal and factual errors underlying [its] mitigation requirements."[13] Mitigation Strategies argued to the Corps on numerous occasions that mitigation was neither necessary nor appropriate under the law. In the alternative, if mitigation was required, Mitigation Strategies argued the law required in-kind mitigation, rather than the purchase of credits from mitigation banks.

---

[7] *Id.*

[8] R. Doc. 31-3 at p. 2.

[9] *Id.* at p. 3.

[10] *Id.*

[11] *See* R. Doc. 31-5.

[12] *Id.* at p. 2.

[13] R. Doc. 31 at ¶64.

The Corps disagreed. On June 24, 2011, the Corps informed Plaintiffs that mitigation is "require[d] [to] be accomplished through the purchase of bank credits."[14] Mitigation Strategies responded to this letter with further efforts to convince the Corps that mitigation was unnecessary. These efforts culminated in a February 20, 2013 letter from the District Commander.[15] The letter reiterated the Corps's previous position that borrow material from Idlewood Stage 2 could not be excavated for use in HSDRRS projects until credits were purchased from a mitigation bank (the "Mitigation Requirement").[16]

Plaintiffs filed suit against the Corps and various Corps employees on June 10, 2013. They contend that the Water Resource Development Act ("WRDA"), 33 U.S.C. § 2201 *et seq.*, does not authorize mitigation for Idlewood Stage 2 or alternatively that the WRDA does not authorize the Corps to mandate the purchase of mitigation credits as the sole form of compensatory mitigation. Plaintiffs also assert claims under the Takings Clause and the Due Process Clause of the Fifth Amendment.

## LEGAL STANDARD

I.  <u>Motion to Dismiss for Lack of Subject Matter Jurisdiction—Rule 12(b)(1)</u>

A Rule 12(b)(1) motion challenges the subject matter jurisdiction of a federal district court. "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to

---

[14] R. Doc. 31-6 at p. 2.

[15] *See* R. Doc. 17-7.

[16] *See id.*

adjudicate the case."[17] In ruling on a Rule 12(b)(1) motion to dismiss, the court may rely on (1) the complaint alone, presuming the allegations to be true; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts and by the court's resolution of disputed facts.[18] The proponent of federal court jurisdiction bears the burden of establishing subject matter jurisdiction.[19]

## II.    Motion to Dismiss for Failure to State a Claim—Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts "to state a claim to relief that is plausible on its face."[20] A claim is "plausible on its face" when the pleaded facts allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[21] In reviewing the legal sufficiency of a complaint, the Court is mindful that Rule 12(b)(6) motions are disfavored under the law and rarely granted.[22]

## III.    Motion for a More Definite Statement—Rule 12(e)

A district court will grant a motion for a more definite statement when the challenged pleading "is so vague or ambiguous that the [moving] party cannot reasonably prepare a response."[23] When adjudicating such motions, the Court

---

[17] *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).

[18] *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420, 424 (5th Cir. 2001).

[19] *See Physicians Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012).

[20] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[21] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[22] *Lowery v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997).

[23] Fed. R. Civ. P. 12(e). The moving party "must point out the defects complained of and the details desired." *Id.*

must assess the complaint in light of the minimal pleading requirements of Rule 8.[24]   Rule 8(a)(2)requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[25]   "Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."[26]   In light of the liberal pleading standard set forth in Rule 8, Rule 12(e) motions are disfavored.[27]

## LAW AND ANALYSIS

Defendants move to dismiss this action on multiple grounds.  Specifically, Defendants argue that (1) Plaintiffs lack Article III standing; (2) Plaintiffs have not challenged a "final agency action" under the Administrate Procedure Act ("APA"), 5 U.S.C. § 501 *et seq.*; (3) dismissal is warranted under the doctrine of "prudential standing;" and (4) Plaintiffs fail to state  a claim for relief under the Takings Clause and Due Process Clause of the Fifth Amendment.

I.   Whether Jurisdiction is Proper

Defendants' first two arguments—lack of Article III standing and final agency action under the APA—are threshold issues that affect this Court's

---

[24] *Babcock & Wilcox Co. v. McGriff, Siebels & Williams, Inc.*, 235 F.R.D. 632, 633 (E.D. La. 2006).

[25] Fed. R. Civ. P. 8(a)(2).

[26] *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation marks and citations omitted).

[27] *See Mitchell v. E–Z Way Towers, Inc.*, 269 F.2d 126, 132 (5th Cir.1959); *Who Dat Yat Chat, LLC v. Who Dat, Inc.*, Nos. 10–1333, 10–2296, 2012 WL 2087439, at *6 (E.D. La. June 8, 2012).

subject matter jurisdiction.[28]  The Court addresses the jurisdictional challenges first.[29]

A.  *Article III Standing*

The doctrine of standing derives from Article III of the Constitution, which limits the jurisdiction of federal courts to "Cases" and "Controversies."[30]  A case is not justiciable unless the plaintiff has standing to sue.[31]  Article III standing has three elements:  "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likel[ihood] that the injury will be redressed by a favorable decision."[32]  The party invoking the federal court's jurisdiction bears the burden of establishing these elements.[33]  Nonetheless, the Supreme Court has cautioned that where, as here, standing is challenged on the pleadings, "general factual allegations of injury resulting from the defendant's conduct may suffice."[34]  This follows from the presumption that

---

[28] *See United States v. Hays*, 515 U.S. 737, 742 (1995) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'") (alteration in original) (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230–31 (1990)); *Peoples Nat'l Bank v. Office of Comptroller of Currency of U.S.*, 362 F.3d 333, 336 (5th Cir. 2004) ("If there is no 'final agency action,' a federal court lacks subject matter jurisdiction.").

[29] *See Sinochem Int'l Co. LTD v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[J]urisdictional questions ordinarily must precede merits determinations in dispositional order.").

[30] U.S. Const. art. III, § 2.

[31] *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998).

[32] *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (alteration in original) (internal quotation marks omitted).

[33] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

[34] *Id.* at 560.

general allegations in a complaint encompass the specific facts necessary to support those allegations.[35]

An injury sufficient to establish Article III standing must be "(a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical."[36] Plaintiffs' allegations of injury are multiple. Specifically, Plaintiffs allege (1) that an existing contract has been harmed,[37] (2) that the Mitigation Requirement is prohibitively expensive, and (3) that they are now subject to increased business competition. At the pleadings stage, these allegations clearly suffice to establish injury-in-fact.[38]

In order to establish the requisite causal connection between injury and misconduct, the plaintiff need not show that the defendant's actions "are the very last step in the chain of causation,"[39] or that the defendant's actions are a proximate cause of his injury.[40] Rather, the plaintiff need only establish his

[35] *Steel Co.*, 523 U.S. at 104.

[36] *Lujan*, 504 U.S. at 560 (internal quotation marks and citation omitted).

[37] At some point after the Corps issued the preliminary report, Plaintiffs contracted with an independent mining company to excavate, process, and sell borrow material from Idlewood Stage 2. The contract provided that Plaintiffs would receive a royalty payment on each ton of borrow material sold.

[38] *See Envtl. Defense Fund v. Marsh*, 651 F.2d 983, 1003 (5th Cir. 1981) ("Economic injury from business competition created as an indirect consequence of agency action can serve as the required 'injury in fact.'"); *Lujan*, 504 U.S. at 578 (finding that "a company's interest in marketing its product free from competition" is a "legally cognizable injur[y]" for purposes of Article III standing). It should be noted that just like the Plaintiffs in this matter, the plaintiffs in *Marsh* alleged a violation of the WRDA.

[39] *Bennet v. Spear*, 520 U.S. 154, 168–69 (1997).

[40] *Lexmark*, 134 S. Ct. at 1391 n.6.

injury is "fairly traceable" to the defendant's actions.[41]

Plaintiffs' injuries are fairly traceable to the Mitigation Requirement. Plaintiffs' contract with the mining company was directly affected by the Mitigation Requirement. Moreover, Plaintiffs allege it will cost approximately $1.64 million to purchase mitigation credits.[42] Obviously, Plaintiffs would not be subject to this financial burden but for the Mitigation Requirement. Plaintiffs further allege the Mitigation Requirement has made their business significantly less profitable, as it requires them to sell borrow material above market price in order to recoup the cost of purchasing mitigation credits.[43]

In response, Defendants narrowly focus on the allegations in the complaint relating to the business relationship between Plaintiffs and the mining company. They argue that Plaintiffs are only harmed by the Mitigation Requirement insofar as the mining company is harmed. According to Defendants, this causal chain is too attenuated to establish standing.

Defendants' argument unduly restricts and misreads the allegations in the complaint. Plaintiffs have clearly alleged the Corps requires the contractor *or* Plaintiffs to provide mitigation.[44] Thus, if Plaintiffs are required to purchase mitigation credits, the resulting economic injury is directly traceable to the Mitigation Requirement. Unlike Defendants' tortuous argument, the allegations establishing causation are straightforward: the Mitigation Requirement imposes

---

[41] *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013).

[42] R. Doc. 31 at ¶62.

[43] *See id.* at ¶82.

[44] *See, e.g.*, *id.* at ¶51.

a substantial cost on Plaintiffs that prohibits the profitable sale of borrow material from Idlewood Stage 2.

Having sufficiently pleaded an injury-in-fact fairly traceable to the Mitigation Requirement, Plaintiffs need only establish redressability, that is, "a likelihood that the requested relief will redress the alleged injury."[45] A plaintiff must demonstrate redressability for each form of relief sought.[46] But where, as here, a plaintiff seeks both declaratory and injunctive relief, these two inquires essentially collapse into one.[47]

Plaintiffs seek a declaration that the Mitigation Requirement violates the WRDA, the Takings Clause, and the Due Process Clause. Plaintiffs also request the Court to enjoin the Corps from requiring any mitigation at all or alternatively from requiring the purchase of mitigation credits as the sole form of compensatory mitigation. The Court clearly has the power to provide the requested relief and finds that a judgment in favor of Plaintiffs would redress their injuries.[48] Plaintiffs have sufficiently pleaded the triad of injury-in-fact, causation, and redressability, and therefore have established standing to sue under Article III.

---

[45] *Steel Co.*, 523 U.S. at 103.

[46] *St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Refining, L.L.C.*, 354 F. Supp. 2d 697, 705 (E.D. La. 2005).

[47] *See Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 906 (10th Cir. 2012) (finding that "if injunctive relief . . . meets the redressability requirement, . . . the same must be true of declaratory relief."

[48] *Cf. Steel Co.*, 523 U.S. at 108 (noting that when a plaintiff "ha[s] alleged a continuing violation or the imminence of a future violation . . . injunctive relief . . . would remedy that alleged harm.").

B.  *Judicial Review Under the APA*

The Federal Government is immune from suit absent a waiver of sovereign immunity.[49]  The APA provides such a waiver and allows judicial review of agency action when (1) the claimant does not seek money damages,[50] (2) no other statute precludes judicial review,[51] and (3) the challenged action is not committed to agency discretion by law.[52]  Plaintiffs do not seek money damages. Moreover, nothing in the WRDA expressly or implicitly precludes judicial review, nor is the provision under which Plaintiffs have filed suit—33 U.S.C. § 2283—discretionary.[53]

Where, as here, the relevant statute does not provide for judicial review,[54] the APA authorizes judicial review of "final agency action for which there is no other adequate remedy" at law.[55]  The question presented is whether the District Commander's February 20, 2013 letter constitutes "final agency action" for purposes of the APA.  The parameters of this inquiry are well-defined.  In order to be considered final, agency action must (1) "mark the consummation of the

---

[49] *Loeffler v. Frank*, 486 U.S. 549, 554 (1988).

[50] 5 U.S.C. § 702.

[51] 5 U.S.C. § 701(a)(1).

[52] 5 U.S.C. § 701(a)(2).

[53] The relevant portions of the statute use the imperative "shall."  *See, e.g.*, 33 U.S.C. § 2283(a)(1)(A), (d).  Given the language chosen, a finding of agency discretion "would fly in the face of [the] text."  *Bennett*, 520 U.S. at 175.

[54] *See Marsh*, 651 F.3d at 1003 ("[T]he WRDA establishes no specific right to judicial review of an agency action.").

[55] *Belle Co. v. U.S. Army Corps of Eng'rs*, No. 13–30262, 2014 WL 3746464, at *2 (5th Cir. 2014); 5 U.S.C. § 704.

agency's decision-making process," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow.[56]   In undertaking this two-part inquiry, the Court is "guided by the Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'"[57]

Agency action satisfies the first part of this inquiry when the agency "has asserted its final position on the factual circumstances underpinning its action," or when the action "has proceeded through an administrative appeal process and is not subject to further agency review."[58]   Reviewing the allegations in the complaint in the light most favorable to Plaintiffs, the Court finds that the District Commander's letter marks the consummation of the Corp's decision-making process.[59]   Defendants have not identified any allegations in the complaint nor provided any evidence to the contrary.

Instead, Defendants contend the District Commander's letter is not final because it does not affect Plaintiffs' legal rights or obligations.  Defendants quote the following language from *National Pork Producers Council v. E.P.A.* in support of their position: "an agency's actions are not reviewable when they merely reiterate what has already been established."[60]   Because the Mitigation

---

[56] *Bennett*, 520 U.S. at 177–78.

[57] *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149–50 (1967)).

[58] *Belle Co.*, 2014 WL 3746464, at *4.

[59] *See Ciba-Geigy Corp. v. E.P.A.*, 801 F.2d 430, 437 (D.C. Cir. 1986) (finding guidance letter marked consummation of decision-making process where court had "no reason to believe that the [author] lack[ed] authority to speak for [the agency] . . . or that his statement of the agency's position could be appealed to a higher level of [the agency's] hierarchy.").

[60] 635 F.3d 738, 756 (5th Cir. 2011).

Requirement has been in effect for years, Defendants argue the District Commander's letter could not have affected Plaintiffs' legal rights. The Court disagrees for multiple reasons.

First, *National Pork Producers* is inapposite. In that case, the court found guidance letters issued by the EPA that "merely restate [a statute's] prohibition . . . have no effect on a party's rights or obligations."[61] The letter issued in this case does not merely restate the requirements of the WRDA. Plaintiffs argue the letter provides an *inaccurate* restatement of the WRDA's mitigation requirement. Moreover, unlike the letters in *National Pork Producers*, the District Commander's letter clearly imposes an affirmative obligation, namely, to purchase mitigation credits prior to the excavation of borrow material from Idlewood Stage 2. This mandate clearly determines rights or obligations by imposing legal consequences on Corps officials administering the Mitigation Requirement and on landowners like Plaintiffs who must comply with the requirement.[62]

The final hurdle to judicial review is that Plaintiffs have no other adequate remedy at law.[63] Given that the WRDA does not provide a private right of action, the Court can conceive of no other way that Plaintiffs could obtain the relief requested other than by filing suit under the APA. Judicial review is proper.

---

[61] *Id.*

[62] *See Nat'l Envtl. Dev. Ass'n's Clean Air Project v. E.P.A.*, 752 F.3d 999, 1007 (D.C. Cir. 2014).

[63] *See Sackett v. E.P.A.*, 132 S. Ct. 1367, 1372 (2012); 5 U.S.C. § 704.

II.  <u>Whether Plaintiffs State a Claim for Relief</u>

Having determined that jurisdiction is proper, the Court may now proceed to a merits determination.  Defendants move to dismiss all of Plaintiffs' claims for lack of prudential standing or alternatively to dismiss Plaintiffs' Fifth Amendment claims under Rule 12(b)(6).  The Court addresses each argument separately.

A. *"Prudential Standing" or "Right to Sue"?*

The Supreme Court's standing jurisprudence has historically consisted of two strands: "Article III standing, which enforces the Constitution's case-or-controversy requirement . . . and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction."[64]   As recently as 2012, the Supreme Court reaffirmed that a litigant must establish both Article III standing and prudential standing as a *sine qua non* to suit under the APA.[65]

The Supreme Court's recent decision in *Lexmark* appears to have severed the legs from the doctrine of prudential standing.[66]   In a unanimous opinion issued earlier this year, the Court explained that the idea that a federal court "can[] limit a cause of action that Congress has created merely because

_____

[64] *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11–12 (2004) (internal quotation marks and citations omitted).

[65] *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012).

[66] *See Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat'l Ass'n*, Nos. 12–20367, 12–20375, 12–20376, 12–20377, 12–20378, 12–20381, 12–20382, 12–10784, 2014 WL 1633508, at *5 (5th Cir. 2014) (recognizing that "the continued vitality of prudential 'standing' is now uncertain in the wake of the Supreme Court's recent decision in Lexmark.").

'prudence' dictates" is fundamentally inconsistent with a federal court's "virtually unflagging" obligation to exercise jurisdiction.[67] Thus, the proper inquiry is not whether a federal court should decline to exercise jurisdiction but instead whether a particular plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue [under the relevant statute]."[68]

A plaintiff establishes the statutory "right to sue"[69] if (1) his interests "fall within the zone of interests protected" by the statute, and (2) his injuries are proximately caused by a violation of the statute.[70] When applied to suit under the APA, the zone-of-interests test "is not especially demanding."[71] "[T]he test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"[72]

---

[67] *Lexmark*, 134 S. Ct. at 1386–88.

[68] *Id.* at 1387. Unlike when a court considers Article III standing, "[t]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." *Id.* at 1387 n.4 (emphasis in original). Accordingly, to the extent the doctrine of prudential standing remains viable, it should no longer be considered alongside Article III standing as a threshold jurisdictional requirement. Rather, prudential standing—in whatever form it still exists—is properly considered on a motion to dismiss for failure to state a claim upon which relief can be granted.

[69] After striking down the doctrine prudential standing, the Court applied its newly-articulated framework under the heading "Static Control's *Right To Sue* Under § 1125(a)." *See id.* at 1387 (emphasis added).

[70] *See id.* at 1388–91. The first element—often referred to as the "zone-of-interests" test—has historically formed part of the prudential standing doctrine. *See id.* at 1368. Despite the apparent repudiation of this doctrine, the zone-of-interests test remains relevant for determining a plaintiff's statutory right to sue. *See id.* at 1388–90.

[71] *Id.* at 1389.

[72] *Id.* at 1389 (quoting *Patchak*, 132 S. Ct. at 2210).

Defendants argue that Plaintiffs impermissibly apply the zone of interests test to multiple provisions of the WRDA, namely, 33 U.S.C. §§ 2281 and 2283. Citing the Supreme Court's 1997 decision in *Bennett*, they argue the test should only be applied to the provision under which suit is brought—in this case, 33 U.S.C. § 2283. According to Defendants, Section 2283 does not protect Plaintiffs' interests. The Court disagrees with this line of argument for multiple reasons.

First, *Bennett* does not support the proposition for which it is cited. The plaintiffs in *Bennett* alleged that a biological opinion issued by the Fish and Wildlife Service violated, *inter alia*, Section 1536 of the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1531 *et seq.*[73] One of the issues presented was whether the plaintiffs had prudential standing to bring this claim under the APA.[74] The court of appeals held that the zone of interests test was not met, "since petitioners are neither directly regulated by the ESA nor seek to vindicate its *overarching purpose* of species preservation."[75] The Supreme Court reversed, holding that whether the zone of interests test is met "is to be determined not by reference to the overall purpose of the Act in question [here, species preservation], but by reference to the particular provision of law upon which the plaintiff relies."[76] Accordingly, the Court applied the zone of interest test to Section 1536.[77]

---

[73] 520 U.S. at 157–60.

[74] *See id.* at 174–77.

[75] *Id.* at 175 (emphasis added).

[76] *Id.* at 175–76 (alteration in original).

[77] *See id.* at 176–77.

Fairly read, *Bennett* does not stand for the proposition that a court is *per se* precluded from considering the overall purpose of the statutory scheme in applying the zone of interests test. Rather, *Bennett* merely held that it was legal error for the court of appeals to focus *solely* on the ESA's purpose to the exclusion of the provision under which suit was brought. Nothing in the opinion categorically forbids the district court from considering the overarching purpose of an act in determining whether a provision of that act protects a particular plaintiff's interests.

Second, even assuming *Bennett* requires the zone of interest test *only* be applied to the statutory provision allegedly violated, the *Lexmark* Court overruled *Bennett* on this point.[78] The plaintiffs in *Lexmark* brought suit under the Lanham Act, alleging false advertising under 15 U.S.C. § 1125(a).[79] As in *Bennett*, the Court addressed whether the plaintiff's interests were co-extensive with those protected by the relevant statute so as to establish prudential standing under the APA. Unlike *Bennett*, however, the *Lexmark* Court answered this question by "examining a detailed statement of the statute's purposes."[80] The Court found that statement in a separate provision of the Lanham Act—Section 1127.[81] The Court then compared the interests articulated in

---

[78] Whether *Lexmark* overruled *Bennett* is a question of first impression in the federal courts.

[79] *See* 134 S. Ct. at 1384.

[80] *Id.* at 1389.

[81] *Id.* Section 1127 provides in relevant part as follows:
"The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered

Section 1127 with those asserted by the plaintiff, ultimately concluding the latter fell within the aegis of the former.[82]  In fact, the Court did not even mention Section 1125 in its zone-of-interests analysis.

*Lexmark* makes clear that—whatever the previous import of *Bennett*—a court may properly consider the overall purpose of a Congressional act when applying the zone of interests test, especially if that purpose is expressly articulated in a separate provision of the act.  Like the Lanham Act, the WRDA contains a detailed statement of the statute's overarching purposes:

> Enhancing national economic development (including benefits to particular regions of the Nation not involving the transfer of economic activity to such regions from other regions), the quality of the total environment (including preservation and enhancement of the environment), the well-being of the people of the United States, the prevention of loss of life, and the preservation of cultural and historical values shall be addressed in the formulation and evaluation of water resources projects to be carried out by the Secretary, and the associated benefits and costs, both quantifiable and unquantifiable, and information regarding potential loss of human life that may be associated with

---

marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations."

[82] *See id.* at 1393.

flooding and coastal storm events, shall be displayed in
the benefits and costs of such projects.[83]

The Plaintiffs' alleged economic injuries fall squarely within the auspices
of the interests protected by the WRDA. This conclusion finds support in Fifth
Circuit precedent. In *Marsh*, the Fifth Circuit interpreted a substantially
similar statement of purpose in a federal water resources statute.[84] That
statement required federal water projects to further the objectives of "enhancing
regional economic development, the quality of the total environment . . . the
well-being of the people of the United States, and the national economic
development."[85] The Fifth Circuit found this language to be "explicit evidence
that Congress intends federal projects to be governed in part by considerations
of local economic development, such as the economic well-being of the
[plaintiff]."[86]

Section 2281(a) of the WRDA contains a virtually identical statement of
purpose.[87] Accordingly, it follows that one objective of the WRDA is to promote
local economic development, which includes the economic well-being of those
affected by WRDA regulations. Plaintiffs allege that a regulation promulgated
under the WRDA—the Mitigation Requirement—has caused them economic
injury. Under the liberal zone-of-interest test applicable to the APA, the Court

---

[83] 33 U.S.C. § 2281(a).

[84] *See* 651 F.3d at 1004–05.

[85] *Id.* at 1004 (alteration in original) (quoting 42 U.S.C. § 1962-2).

[86] *Id.* at 1004.

[87] *See supra* note 83.

has no problem concluding that the interests asserted in the complaint are sufficiently consistent with the interests the WRDA is designed to protect.

Plaintiffs have passed the zone-of-interest test, and the Court must now determine whether the allegations in the complaint establish proximate causation.[88]   The question presented "is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits."[89]   Put differently, a court inquires whether the plaintiff's injuries are "too remote from the defendant's unlawful conduct."[90]

Applying these precepts to the case at bar, the Court finds that Plaintiffs have adequately pleaded a causal connection between their injuries and Defendants' alleged misconduct.   The economic injury alleged by Plaintiffs would not have occurred but for the Mitigation Requirement.   Accordingly, Plaintiffs have the right to sue under Section 2283 of the WRDA.

B.  *The Takings Clause*

The Takings Clause of the Fifth Amendment prohibits the government from taking private property for public use without just compensation.[91]   The Supreme Court recognizes two distinct classes of takings that require

---

[88] *See Lexmark*, 134 S. Ct. at 1393.

[89] *Id.* at 1390.

[90] *Id.* (internal quotation marks omitted).

[91] U.S. Const. amend. V, cl.4.   The purpose of the Takings Clause is to prevent the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

compensation.[92]  The first involves the "direct appropriation" of private property or the "practical ouster of [the owner's] possession."[93]  The other type of taking—a so-called "regulatory taking"—occurs when government regulation of private property is "so onerous that its effect is tantamount to a direct appropriation or ouster."[94]  Plaintiffs allege the Corps's actions constitute a regulatory taking.

The Supreme Court has generally eschewed any set formula for determining whether a regulatory action constitutes a taking.[95]  Nonetheless, certain bright-line rules have emerged.  For example, when the owner is required to endure a "permanent physical invasion" of his property, the government must provide just compensation.[96]  Another type of *per se* taking occurs when a regulation "denies all economically beneficial or productive use of land."[97]

Neither of these situations is presented by the case at bar.  Plaintiffs do not allege a direct appropriation of their land.  Moreover, the allegations in the complaint do not indicate  that Plaintiffs have been completely deprived of any beneficial uses so as to leave their property "economically idle."[98]  Rather,

---

[92] *See Yee v. City of Escondido, Cal.*, 503 U.S. 519, 522–23 (1992).

[93] *Lucas v. S.C. Coastal Coalition*, 505 U.S. 1003, 1014 (1992).

[94] *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).

[95] *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 326 (2002); *Lucas*, 505 U.S. at 1015.

[96] *Lingle*, 544 U.S. at 538.

[97] *Lucas*, 505 U.S. at 1015.

[98] *Id.* at 1019.

Plaintiffs allege the Mitigation Requirement made Idlewood Stage 2 "less valuable,"[99] thereby implying the land still retains *some* value. The Supreme Court has clarified that the "total takings rule" only applies in the "extraordinary circumstance" where government regulation "wholly eliminate[s] the value" of private property.[100]

Subject to one exception inapplicable here,[101] the constitutionality of a regulatory taking is measured against the "justice and fairness" of the governmental action.[102] To elucidate these abstract concepts, the Supreme Court has enumerated multiple factors a court may consider, including "the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action."[103] This inquiry is necessarily fact-intensive,[104] and is

---

[99] *See* R. Doc. 31 at ¶83; *see also id.* at ¶118 (alleging the Mitigation Requirement "substantially decreases the value of the Idlewild Stage 2 tract"); *id.* at ¶134 ("[T]he economic impact of the [Mitigation Requirement] . . . is . . . in the form of . . . dramatic depreciation of property value.").

[100] *See Tahoe–Sierra*, 535 U.S. at 1483.

[101] In *Lingle*, the Supreme Court held that land-use exactions are not subject to the multi-factor balancing test described *infra* but are instead analyzed according to the Court's decisions in *Nollan v. California Coastal Communication,* 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994). *See Lingle*, 544 U.S. at 546–48.

[102] *See E. Enters. v. Apfel*, 524 U.S. 498, 523 (1998).

[103] *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (citing *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978)).

[104] *See Tahoe–Sierra*, 535 U.S. at 322 ("Our regulatory takings jurisprudence . . . is characterized by essentially ad hoc, factual inquiries, . . . designed to allow careful examination and weighing of all the relevant circumstances.") (internal quotation marks and citations omitted); *Yee*, 503 U.S. at 523 (noting that a regulatory takings analysis "necessarily entails complex factual assessments of the purposes and economic effects of government actions.").

therefore "seldom" appropriate for resolution on the pleadings.[105]  The Court finds no reason to deviate from this general rule and will therefore deny the motion to dismiss.

C. *Due Process*

The Fifth Amendment forbids the deprivation of "life, liberty, or property, without due process of law."[106]  Due process offers both substantive and procedural protections.[107] The procedural component ensures that an individual is given notice and an opportunity to be heard before he or she is a deprived of a property interest,[108] whereas the substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them."[109]

Defendants move to dismiss Plaintiffs' claim for violation of their rights to procedural due process.  The complaint, however, does not assert a procedural due process claim.   Rather, it alleges the Corps's decision to impose the Mitigation Requirement was arbitrary and capricious.[110] Accordingly, Plaintiffs

---

[105] *McDougal v. Cnty. of Imperial*, 942 F.2d 668, 676 (9th Cir. 1991).  As the Ninth Circuit explained in an earlier opinion: "Th[e] admonition [against Rule 12(b)(6) dismissal] is perhaps nowhere so apt as in cases involving claims of inverse condemnation where the Supreme Court itself has admitted its inability to develop any set formula for determining when compensation should be paid, . . . resorting instead to essentially ad hoc, factual inquiries to resolve this difficult question." *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir. 1986) (internal quotation marks and citation omitted).

[106] U.S. Const. amend. V, cl. 3.

[107] *See Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1528 (5th Cir. 1993).

[108] *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

[109] *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (internal quotation marks omitted).

[110] *See* R. Doc. 31 at ¶¶138–44.  Plaintiffs' opposition memorandum also makes clear that their claim is one for substantive due process; not procedural due process.  *See* R. Doc. 37

23

clearly invoke the substantive protections of the Due Process Clause.[111]  Because Plaintiffs have not asserted a procedural due process claim, the motion to dismiss same is denied.

III.    <u>Whether the Court Should Compel a More Definite Statement</u>

Defendants argue the complaint is impermissibly vague for failure to "put forward a specific legal theory supported by citations."[112]  This argument is deficient from root to stem.  The law is clear that a complaint need not identify with precision the legal basis for the relief requested.[113]  Rather, a complaint satisfies the liberal pleading requirements of Rule 8 if it alleges facts sufficient to provide notice of a claim.[114]  The complaint does just that.  Moreover, by filing a motion to dismiss discrete claims, Defendants refute their own argument that the complaint is too vague to answer.[115]  The motion for a more definite statement is denied.

---

at p. 24–25.

[111] In "rare cases," a substantive due process claim may be premised on a deprivation of property.  *See Simi Inv. Co. v. Harris Cnty., Tex.*, 256 F.3d 323, 323–24 (5th Cir. 2001) (per curiam).  The Court need not address whether this case presents one of those rare circumstances.

[112] R. Doc. 32-1 at p. 24.

[113] *See McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 551 (5th Cir. 2003) ("The plaintiff need not correctly specify the legal theory, so long as the plaintiff alleges facts upon which relief can be granted."); *Dileo v. Lakeside Hosp.*, No. 09–2838, 2010 WL 1936221, at *3 (E.D. La. May 12, 2010) ("Although plaintiffs do not specifically identify the legal basis for their claims, such specificity is not required under the federal rules.").

[114] *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002).

[115] *See Murungi v. Tex. Guaranteed*, 646 F. Supp. 2d 804, 811 (E.D. La. 2009) (denying motion for more definite statement where defendant had previously filed answers and motions to dismiss).

## CONCLUSION

Plaintiffs have established standing and therefore the justiciability of this case under Article III. Furthermore, the Court finds that judicial review is proper under the APA, that Plaintiffs state a claim for relief under the Fifth Amendment, and that the complaint satisfies the notice pleading requirement of Rule 8. Accordingly, the instant Motion is denied in its entirety.

New Orleans, Louisiana, this 2nd day of September, 2014.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**