# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **WHITE OAK REALTY, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO: 13–4761** |
| **UNITED STATES ARMY CORP OF ENGINEERS, ET AL.** | **SECTION "H"(3)** |

## ORDER AND REASONS

Before the Court are Cross-Motions for Summary Judgment (Docs. 100, 102).  For the following reasons, summary judgment is granted in favor of Defendants.

## BACKGROUND

This is a civil action for declaratory and injunctive relief.  The plaintiffs are White Oak Realty, LLC and Citrus Realty, LLC.  The defendants are the United States Corps of Engineers (the "Corps") and various Corps employees.  The dispute involves mitigation requirements imposed by the Corps on a tract of land in Southeast Louisiana ("Idlewood Stage 2"), jointly owned by Plaintiffs.

In response to the devastation caused by Hurricanes Katrina and Rita, Congress authorized the Corps to undertake a series of projects collectively

1

known as the Hurricane and Storm Damage Risk Reduction System ("HSDRRS").  One of these projects involves the use of soil and clay ("borrow material") to reinforce levees and floodwalls in the Gulf South.  In order to respond to the unprecedented amount of borrow material needed for this project, the Corps instituted the contractor-furnished borrow program.  The contractor-furnished borrow program allows landowners to have their land pre-qualified as a suitable source for borrow material based on certain requirements. [1]  These government-approved properties are then placed on a list for selection as supply sources by contractors working on the levee project. Contractors may then select a borrow supplier from that list, and the borrow is excavated for use on the Corps's projects.

     At some point in 2010, Plaintiffs discovered the presence of borrow material on their property.  They subsequently filed a "suitability determination" with the Corps to confirm the borrow material could be used in HSDRRS projects.  Some of the property (Idlewild Stage 1) was quickly qualified and clay mining began.  On other portions (Idlewild Stages 2 and 3), the Corps approved the land's use for borrow material but found that the excavation of borrow material would cause "unavoidable impacts" to the bottomland hardwood ("BLH") forests on the property, and therefore mitigation would be required.  In addition, the portions of the land that were wetlands were excluded from excavation.  Plaintiffs, therefore, sought to mine clay only from the uplands portions of Idlewild Stage 2 and that area was later cleared of the BLH forest.

     In a letter dated November 4, 2010, the Corps notified Plaintiffs that Idlewood Stage 2 "appears to be acceptable for use as a source" of borrow material.  The letter confirmed the preliminary report's determination that

_____

[1] Doc. 115-4, p. 12.

excavation would harm the environment.  The letter required "proof of mitigation to the Corps[] . . . prior to excavation."  The Corps issued a similar letter on April 14, 2011, reaffirming the requirement that the impacts to the BLH forests on the land be mitigated.  The letter informed Plaintiffs that their "compensatory mitigation requirements may be met" by obtaining credits from select mitigation banks.

Plaintiffs subsequently hired Mitigation Strategies, LLC ("Mitigation Strategies") hoping to convince the Corps of the "legal and factual errors underlying [its] mitigation requirements."  Mitigation Strategies argued to the Corps on numerous occasions that mitigation was neither necessary nor appropriate under the law.  In the alternative, if mitigation was required, Mitigation Strategies argued the law required in-kind mitigation, rather than the purchase of credits from mitigation banks.

The Corps disagreed. A February 20, 2013 letter from the District Commander reiterated the Corps's position that if borrow material from Idlewood Stage 2 is used in connection with the HSDRRS project, the impacts to the BLH forests on that land must be mitigated (the "Mitigation Requirement").  It further confirmed the Corps's position that such mitigation must occur through the purchase of mitigation bank credits (the "Purchase Requirement").

As a result of the Corps's position, Plaintiffs filed this suit, arguing that the Water Resource Development Act of 2007 ("WRDA"), 33 U.S.C. § 2201 et seq., does not require mitigation for Idlewood Stage 2 or alternatively, that the WRDA does not authorize the Corps to mandate the purchase of mitigation credits as the sole form of compensatory mitigation.  Plaintiffs also assert

claims under the Takings Clause of the Fifth Amendment.[2]  The parties have filed cross-motions for summary judgment on all of Plaintiffs' claims.

## LEGAL STANDARD

"The [APA] allows a federal court to overturn an agency's ruling only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole."[3]  The Court begins with the "presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous."[4]  The agency's factual findings will be upheld so long as they are supported by substantial evidence.[5]  "The agency's legal conclusions are reviewed de novo, except for questions of statutory interpretation, where the court owes substantial deference to an agency's construction of a statute that it administers."[6]

The Court must also be mindful of the two-step process of judicial review of agency action outlined in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*[7]  Pursuant to *Chevron*, a court reviewing an agency's construction of a statute must first ask "whether Congress has directly spoken to the precise question at issue."[8]  If Congressional intent is clear, "that is the end of the matter."[9]  If, however, the statute is silent or ambiguous with regard to the specific issue, the question then becomes whether agency action is "based on a

---

[2] Plaintiff's due process claims have previously been dismissed by this Court. Doc. 142.
[3] *Buffalo Marine Servs. Inc. v. U.S.*, 663 F.3d 750, 753 (5th Cir. 2011).
[4] *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010).
[5] *Buffalo Marine Servs. Inc.*, 663 F.3d at 753.
[6] *Id.*
[7] 467 U.S. 837 (1984).
[8] *Id.* at 842.
[9] *Id.* at 843.

permissible construction of the statute."[10]  "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."[11]  Indeed, the Court cannot substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."[12]

## LAW AND ANALYSIS

I.   Jurisdiction

At the outset, Defendants argue that this Court lacks jurisdiction under the APA to hear Plaintiffs' claims because no final agency action has taken place.  Defendants originally propounded this argument in their Motion to Dismiss.[13]  Under a Rule 12(b)(1) standard, this Court held that the Corps's February 20, 2013 letter constituted a final agency action.[14]  Defendants have reurged this argument in their summary judgment motion and argue that Plaintiffs cannot carry the burden of proving that the February 20 letter was "rights-determining."

In order to be considered final, an agency action must (1) "mark the consummation of the agency's decision-making process," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow."[15]  Defendants contend that Plaintiffs cannot meet the second prong because the February 20 letter merely states the Corps's opinions

---

[10] *Id.* at 843–44.
[11] *Id.*
[12] *Id. at 844.*
[13] Doc. 32.
[14] Doc. 42.
[15] *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997).

5

on the borrow program requirements and the legal authority upon which it relies.  Defendants heavily on the Fifth Circuit's opinion in *Belle Co. v. US Army Corp*, which states that a jurisdictional determination that the plaintiff's property contained wetlands was not a final determination because the plaintiff had an array of alternatives to choose from and was not required to act in any particular way.[16]  After Defendants filed their motion, however, the Supreme Court reversed and remanded *Belle* for further consideration in light of *Army Corp v. Hawkes Co.*[17]  In *Hawkes*, the Supreme Court held that a jurisdictional determination that a particular piece of property contains "waters of the United States" and is subject to the Clean Water Act is a final agency action.[18]  It stated that "[t]he definitive nature of the approved [jurisdictional determination] . . . gives rise to 'direct and appreciable legal consequences.'"[19]  Despite this, Defendants subsisted at oral argument in their belief that no final agency action has occurred in this case, and this Court ordered supplemental briefing.

In their supplemental briefing, Defendants argue that the February 20, 2013 letter at issue here differs from the jurisdictional determination in *Hawkes* and therefore does not amount to a final agency action.  Defendants argue that the letter "requires nothing of [Plaintiffs] and they are free to do as they choose with the property."[20]  Defendants' argument, however, ignores the Court's analysis in *Hawkes*, which states that a jurisdictional determination declaring property as wetlands is a final agency action because it results in

---

[16] *Belle Co. v. U.S. Army Corps of Engineers*, 761 F.3d 383 (5th Cir. 2014), cert. denied sub nom. *Kent Recycling Servs., LLC v. U.S. Army Corps of Engineers*, 135 S. Ct. 1548 (2015), reh'g granted, order vacated, 136 S. Ct. 2427 (2016), and cert. granted, judgment vacated sub nom. *Kent Recycling Servs., LLC v. U.S. Army Corps of Engineers*, 136 S. Ct. 2427 (2016).
[17] *Kent Recycling Servs., LLC v. U.S. Army Corps of Engineers*, 136 S. Ct. 2427 (2016).
[18] *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807 (2016).
[19] *Id.*
[20] Doc. 165.

legal consequences, namely the loss of the five year safe harbor. This is true despite the fact that such a declaration does not require the property owner "to do or refrain from doing anything to its property."[21] It simply notifies the property owner that a permit will be required prior to taking certain actions on the property.[22]  Indeed, just as in *Hawkes*, the letter at issue here does not require the Plaintiffs to do or refrain from doing anything but merely requires that they show proof of mitigation prior to supplying borrow material to the Corps. This requirement is a "direct and appreciable legal consequence" for Plaintiffs under the analysis set forth in *Hawkes*. In addition, Defendants have not identified an alternative route by which Plaintiffs could have the Corps's action reviewed. Accordingly, this Court holds that the February 20, 2013 letter constitutes a final agency action, and this Court therefore has jurisdiction to hear Plaintiffs' claims.

II.    The Mitigation Requirement

The Court next considers Plaintiffs' argument that the Corps's Mitigation Requirement conflicts with the plain language of the WRDA. Under *Chevron*, this Court must first consider "whether Congress has directly spoken to the precise question at issue"—that is, whether the Corps can require mitigation for the loss of BLH forests on property from which contractor-supplied borrow material is excavated for use in a Corps project. Plaintiffs allege that the WRDA does not require mitigation for impacts that do not directly result from a water resource project. Specifically, Plaintiffs allege that the WRDA is intended to address only those environmental impacts that directly result from a water resource project—such as those impacts sustained by the land on which a levee is erected—and not those that result

---

[21] *Belle Co.*, 761 F.3d at 391.
[22] *Id.*

7

indirectly—such as those sustained by land from which borrow material is taken for use on the levee.   Plaintiffs argue that requiring mitigation for indirect impacts is inconsistent with the statutory plan set forth by the WRDA.

First, Plaintiffs argue that the WRDA requires the Corps to assess potential environmental impacts in advance of a project and plan for mitigation of those impacts.[23]   Indeed, 33 U.S.C. § 2283(d)(1) states that a proposal for a water resources project must contain "a recommendation with a specific plan to mitigate for damages to ecological resources, including terrestrial and aquatic resources, and fish and wildlife losses created by such project." Plaintiffs argue that the Mitigation Requirement conflicts with this mandate because Defendants are unable to assess and plan for the impacts resulting from the excavation of contractor-furnished borrow material until the contractor selects a borrow supplier.   Because it is not known at the outset which suppliers will be selected and the environmental impact of extracting borrow material from the land owned by those suppliers, the Corps cannot plan to mitigate those impacts in advance.   Plaintiffs argue that the total project impact will not be known before the project is begun, making it impossible to comply with the proposal requirements of 33 U.S.C. § 2283(d).

Second, Plaintiffs argue that the Mitigation Requirement conflicts with the WRDA's requirement that mitigation must occur before construction begins on the project (and therefore before the impact has occurred).   Indeed, the WRDA states that mitigation "shall be undertaken or acquired before any construction of the project . . . commences, or [] shall be undertaken or acquired concurrently with lands and interests in lands for project purposes (other than mitigation of fish and wildlife losses.)"[24]   Plaintiffs argue that the Mitigation

---

[23] *See* 33 U.S.C. § 2283(d).
[24] 33 U.S.C. § 2283(a).

Requirement is inconsistent with the WRDA because it does not require mitigation prior to construction, but rather, only requires that mitigation occur before borrow is excavated from a supplier's land.  In addition, mitigation is only required if a supplier is selected to provide borrow for the project. However, the impact—the destruction of BLH forests—may have, as here, long predated the mitigation.

Finally, Plaintiffs argue that the Mitigation Requirement conflicts with the WRDA's budget requirements.  Pursuant to 33 U.S.C. § 2283, costs of mitigation must be accounted for in the project budget.  Plaintiffs contend that the Mitigation Requirement allows the Corps to shift these costs to private contractors and suppliers and circumvent their inclusion in the project budget.

In response to Plaintiffs' argument that the Mitigation Requirement is inconsistent with the prior planning, budgeting, and mitigating requirements of the WRDA, Defendants point to the plain language of the WRDA, which states that the Corps must mitigate for losses "resulting from any water resources project" or "created by such project."  Indeed, the WRDA, does not address a distinction between "direct" and "indirect" impacts, as Plaintiffs have coined them.  Based on the plain language of the WRDA, Defendants argue that the Corps's determination that impacts to borrow sites resulting from levee construction must be mitigated is per se reasonable and rationally based. They argue that this provision is unambiguous and thus entitled to deference under *Chevron* step one.

In assessing both of the parties' arguments, it is clear to this Court that the WRDA is ambiguous as to whether the Corps can require mitigation for the loss of BLH forests on property from which contractor-supplied borrow material is excavated for use in building levees as part of the HSDRRS project. While the plain language of the statute seems to indicate that all impacts must

be mitigated, Plaintiffs point to some of the statute's requirements that may be inconsistent with such a rule. For instance, the WRDA could be read, as Plaintiffs have, to require that the Corps submit a proposal and budget for the mitigation of all impacts of a water resources project at the time authorization is sought for that project.[25] If the WRDA mandates such a comprehensive proposal, then the Mitigation Requirement, through which the extent of mitigation required is not determined until a supplier is selected by a contractor, would be inconsistent with this mandate.

Having found that the WRDA is ambiguous as to the precise question at issue, this Court must move to *Chevron* Step Two and determine "whether the agency's answer is based on a permissible construction of the statute." This Court holds that it is.

As Plaintiffs point out, "[t]he WRDA statutory scheme contemplates that the Corps, not private parties, will be conducting mitigation."[26] Typically if borrow is required for a Corps project, the Corps will acquire a borrow site and pay just compensation to the owner.[27] The Corps then mitigates for impacts caused by excavation on the land that it has acquired. That said, the aftermath of Hurricane Katrina was not a typical situation. The project of reinforcing the levees and floodwalls in the New Orleans area, which required an "unprecedented amount of borrow material," was undertaken on an expedited schedule "in light of the risk posed to the area by an unfinished system."[28] "In order to facilitate the use of vast amounts of borrow material needed to construct the [HSDRRS], [the Corps] determined that it was in the best interest of the Government for certain construction contracts to require the

---

[25] *See* 33 U.S.C. § 2283(d)(1).
[26] Doc. 111.
[27] Doc. 102-1.
[28] Doc 102-1.

10

contractor to furnish its own borrow material."[29]   The Corps therefore instituted the contractor-furnished borrow program, a shift from usual protocol.

While the contractor-furnished borrow program may differ from the typical process in which borrow is furnished by the government, the end result is the same—borrow is excavated from land for use on a Corps project. That said, this Court can see no policy reason why mitigation should not still be required. "Plaintiffs do not contest that the Corps must mitigate for impacts caused by the Corps's own borrow excavation in the government-furnished borrow program, or elsewhere."[30] The Corps cannot then bypass this obligation by using contractor-furnished borrow instead. Such a holding would be counter to the policy espoused by the WRDA.

Policy arguments aside, the Mitigation Requirement is a reasonable interpretation of the WRDA. The WRDA plainly states that the Corps is required to mitigate for any impacts "resulting from" or "created by" a water resources project such as the HSDRRS. Plaintiffs admit that the impacts created on land from which government-furnished borrow is excavated are project impacts that must be mitigated. It necessarily follows, then, that impacts created on the land from which contractor-furnished borrow is excavated are project impacts as well. Each are effects on the land from which borrow is removed for a Corps's project. The WRDA does not differentiate between impacts that are created on land owned by the government or otherwise. This Court finds that the Corps was reasonable in reaching this conclusion and requiring mitigation of the impacts to BLH on these sites, especially in light of the substantial deference owed to an agency's construction

---

[29] Doc. 115-17, p. 19.
[30] Doc 111, p. 3.

of a statute under its administration.  Accordingly, this Court holds that the Corps's imposition of the Mitigation Requirement is based on a permissible construction of the statute and does not violate the WRDA.

III.   <u>The Purchase Requirement</u>

Having held that the Mitigation Requirement complies with the WRDA, this Court must now address Plaintiffs' arguments regarding the Purchase Requirement, which mandates that the only way to satisfy the Mitigation Requirement is to purchase mitigation bank credits.  The question at issue here is whether the Corps can require the purchase of wetland mitigation credits as the sole option for satisfying the Mitigation Requirement.  Plaintiffs argue that this requirement is arbitrary and capricious.

The WRDA speaks expressly to the mitigation of BLH forests, stating that "mitigation plans shall ensure that impacts to bottomland hardwood forests are mitigated in-kind, and other habitat types are mitigated to not less than in-kind conditions, to the extent possible."[31]  In-kind mitigation of the impacts to upland BLH forests requires the purchase of upland mitigation credits from the same region or an alternative mitigation plan addressing upland BLH forests.  Instead, the Corps has required Plaintiffs to purchase credits from a *wetland* mitigation bank in the same region.

At oral argument, the parties agreed there are no upland BLH mitigation credits available to purchase in the region at issue.  In addition, the record reveals that the Corps felt that consideration of individual mitigation projects would be less efficient, timely, and effective than requiring the purchase of credits.  The Corps explained that "[t]he creation and approval of a mitigation plan . . . is a lengthy and detailed process that can take a year or more. . . . Not only does the [Corps] not have the manpower to devote to this process for every

---

[31] *See* 33 U.S.C. § 2283(d).

12

contractor-furnished borrow site, but it would significantly delay the approval and use of those sites."[32]   As previously discussed, the HSDRRS was undertaken on an expedited basis, and the Corps did not feel it had time to consider individual mitigation plans.  "The advantage of mitigation banks is that they have already been approved and credits are readily available."[33] Accordingly, for all intents and purposes, mitigation in-kind was not possible, and the Corps resorted to the next most applicable form of mitigation—wetland BLH mitigation bank credits from the same region.  This decision was not arbitrary and capricious, but rather, was in line with "the objective of ensuring that Risk Reduction System projects are expeditiously built to protect the residents of Greater New Orleans."[34]

In addition, Corps regulations reveal a preference for mitigation through mitigation bank credits.[35]  The regulations reveal that bank credits are preferred for several reasons: (1) they can "help reduce risk and uncertainty;" (2) they can "help reduce risk that mitigation will not be fully successful;" (3) they "typically involve larger, more ecologically valuable parcels, and more rigorous scientific and technical analysis, planning and implementation than permittee-responsible mitigation;" (4) they require "site identification in advance, project-specific planning, and significant investment of financial resources that is often not practicable for many in-lieu fee programs."[36]   Indeed, the Corps admits that pursuant to the WRDA it is ultimately responsible for ensuring that mitigation is completed.  Requiring the purchase of mitigation credits, then, eliminates the possibility that the

---

[32] Doc. 115-17, p. 19–20.

[33] *Id.*

[34] Doc. 106.

[35] 33 C.F.R. § 332.3; *see also* 33 U.S.C. § 2317b.

[36] 33 C.F.R. § 332.3(b)(2).

13

Corps will be required to step in to complete a mitigation project or that mitigation will go unfinished.

Finally, Plaintiffs make much ado about the Corps's requirement that they pay for mitigation, arguing that it is the Corps's responsibility to pay for and undertake mitigation. Indeed, this Court agrees that the ultimate responsibility for mitigation lies with the Corps. The Mitigation and Purchase Requirements put the initial onus on the landowner or contractor to foot the bill for the mitigation credits, but the cost will ultimately lie with the Corps. As the mitigation credits increase the contractors' expenses, so too will the amount it charges the Corps for those services increase. This Court does not find then that the Corps has, as Plaintiffs put it, attempted to shift its responsibilities under the WRDA by implementing the Mitigation and Purchase Requirements.

For all of the foregoing reasons, this Court holds that the Purchase Requirement is in line with the plain language of the WRDA and is a reasonable interpretation thereof. The Corps was not arbitrary or capricious in requiring the purchase of mitigation credits to satisfy the Mitigation Requirement.

IV. <u>Takings Claim</u>

Finally, Plaintiffs allege the Corps's actions constitute a taking. The Takings Clause of the Fifth Amendment prohibits the government from taking private property for public use without just compensation.[37] Plaintiffs allege that the Mitigation and Purcahse Requirements amount to takings under the analysis set forth in *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987),

---

[37] U.S. Const. amend. V, cl.4. The purpose of the Takings Clause is to prevent the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

*Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Koontz v. St. Johns River Water Management District*, 133 S. Ct. 2586 (2013), because the Corps has "commanded that Plaintiffs relinquish funds in order to use their property in a particular way."  Plaintiffs seek a declaratory judgment that "the Corps's actions violate the Takings Clause of the Constitution's Fifth Amendment" and an injunction allowing Plaintiffs to forgo the Corps's Mitigation Requirement.[38]

In response, Defendants argue that the takings cases cited by Plaintiffs are inapplicable here.[39]  Defendants point out that *Nollan*, *Dolan*, and *Koontz* each consider whether the conditions of a land use permit amount to a taking. Unlike these cases, Plaintiffs' land is not subject to any regulatory action or land-use permit, but instead, the Mitigation and Purchase Requirements are obligations set forth in the Corps's contracts with levee contractors. Defendants argue that, therefore, this line of cases and the *per se* takings analysis used therein are inapplicable.  Plaintiffs rebut that the Mitigation and Purchase Requirements are regulatory despite being imposed through a contract because they implicate the sovereign interest of the federal government and its public policy.  Plaintiffs contend that the Mitigation and Purchase Requirements are regulatory actions subject to a *per se* takings analysis.

In support of their position, Plaintiffs point to cases discussing whether a law is regulatory or proprietary as part of a federal preemption analysis.[40]

---

[38] Doc. 31, p. 30.

[39] Defendants also propound jurisdictional arguments already rejected by this Court. Doc. 142.

[40] *See Se. Louisiana Bldg. & Const. Trades Council, AFL-CIO v. Louisiana ex rel. Jindal*, 107 F. Supp. 3d 584, 597–603 (E.D. La. 2015) (discussing whether a state law prohibiting project labor agreements was proprietary or regulatory and thus subject to preemption by the NLRA);  *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 36 (D.C. Cir. 2002) (discussing whether an executive order that that provided that no federal

While these cases provide some helpful language regarding whether the government's actions are proprietary or regulatory, none address the question at hand.[41]   The issue is whether the *per se* takings analysis used in *Dolan*, *Nollan*, and *Koontz* should be extended to apply to conditions set forth by contract, rather than in land use permits.  Plaintiffs have not provided this Court with any case using a *per se* takings analysis when the condition at issue was contractual.  Accordingly, this Court declines to extend the *per se* takings analysis to this matter.

Even assuming, however, that the *per se* takings analysis applied here, Plaintiffs could not succeed on their takings claim regarding the Mitigation Requirement.  In *Koontz*, the Supreme Court held that a monetary exaction for mitigation as a condition of a land use permit must have an essential nexus and rough proportionality to the impacts of the proposed development.[42] Regulations lacking a nexus and proportionality will be considered takings. Plaintiffs argue that the Mitigation Requirement cannot satisfy this test because the BLH forests on Idlewild Stage 2 were cut down years ago.  "The requirement that those trees now be replaced is not sufficiently related to the excavation of clay for HSDRRS use because the trees are gone whether Plaintiffs excavate and sell clay to the Corps or not.[43]   This Court finds, however, that Plaintiffs removed the trees at issue after their land had been

---

agency could require bidders for a construction contract to enter into a project labor agreement was regulatory or proprietary and thus preempted by the NLRA); *Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tex.*, 180 F.3d 686, 696 (5th Cir. 1999) (discussing whether a towing ordinance was proprietary or regulatory and thus preempted by federal law).

[41] *See Allbaugh*, 295 F.3d at 36 ("A condition that the Government imposes in awarding a contract or in funding a project is regulatory only when, as the Supreme Court explained in *Boston Harbor*, it 'addresse[s] employer conduct unrelated to the employer's performance of contractual obligations to the [Government].'").

[42] *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2599 (2013).

[43] Doc 100-1, p. 43.

approved for use in the contractor-furnished borrow program and the Mitigation Requirement had been instituted. Plaintiffs therefore ask this Court to find that the Mitigation Requirement constitutes a taking by looking to events that occurred after its announcement. Plaintiffs cannot convert the Mitigation Requirement into a taking by their own unilateral acts. Such a holding would lead to absurd results, in which parties subject to mitigation requirements could simply destroy the valued resources to avoid mitigating their loss. This Court holds that the Mitigation Requirement has the essential nexus and proportionality to the impacts on the BLH forests on Idlewild Stage 2. The requirement requires mitigation as mandated by the WRDA for only those portions of BLH that are affected by the excavation of borrow material for use on the HSDRRS project. The WRDA communicates the government's clear interest in protecting BLH forests. Accordingly, Plaintiffs would not succeed on their *per se* takings claim even if such analysis applies in these circumstances.

## CONCLUSION

For the foregoing reasons, summary judgment is granted in favor of Defendants. Plaintiffs' APA and *per se* takings claims are dismissed with prejudice. The only remaining claim is Plaintiffs' regulatory takings claim.

New Orleans, Louisiana, this 14th day of September, 2016.

JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE

17